**ORIGINAL**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| HOLLYWOOD CASINO CORPORATION, | § § § | |
| Plaintiff, | § § | Civil Action No. 3-02CV0325-M |
| v. | § § | |
| HAROLD C. SIMMONS, CONTRAN CORPORATION, VALHI, INC., JACK E. PRATT, and WILLIAM D. PRATT, | § § § § § | COMPLAINT AND JURY DEMAND |
| Defendants. | § § | |

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
FEB 15 2002
CLERK, U.S. DISTRICT COURT
By _____
Deputy

Plaintiff Hollywood Casino Corporation ("Plaintiff" or "Hollywood") files this Complaint and Jury Demand against Harold C. Simmons ("Simmons"), Contran Corporation ("Contran"), Valhi, Inc. ("Valhi"), Jack E. Pratt ("Jack Pratt"), and William D. Pratt ("Bill Pratt") (collectively "Defendants"), on personal knowledge as to their own acts, and upon information and belief as to all others, as follows:

## I.

## PRELIMINARY STATEMENT

This action is filed to protect Plaintiff from Defendants' covert assault on Hollywood, a publicly-traded corporation. Despite clear proscriptions against such activity, Defendants have joined together in an effort to surreptitiously obtain control of Hollywood. Defendants' blatant violations of federal securities laws must be stopped. Accordingly, Hollywood files this action to protect itself and its shareholders.

## II.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa because this is a civil action arising under the federal securities laws. This Court has supplemental jurisdiction over Hollywood's common law claims pursuant to 28 U.S.C. § 1367(a).

2. This Court has personal jurisdiction over Defendants because Defendants reside in, or regularly transact business in, the State of Texas.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because it is a judicial district where Defendants reside and/or where a substantial part of the events or omissions giving rise to the claims asserted herein occurred.

## III.

## PARTIES

### A. Plaintiff

4. Hollywood is a publicly-traded corporation organized and existing under the laws of the State of Delaware with its principal place of business in Dallas, Texas.

### B. Defendants

5. Jack Pratt is a member of Hollywood's Board of Directors. Jack Pratt may be served with process at 5055 Park Lane, Dallas, Texas, 75220.

6. Bill Pratt is a member of Hollywood's Board of Directors. He may be served with process at 14710 Celestial Place, Addison, Texas, 75254.

7. Simmons is an individual residing in Dallas, Texas. Simmons may be served with process at 5430 LBJ Freeway, Suite 1700, Dallas, Texas, 75240-2697.

8. Contran, a corporation formed under the laws of the State of Delaware, is a holding company with its principal place of business in Dallas, Texas. Contran may be served with process at 5430 LBJ Freeway, Suite 1700, Dallas, Texas, 75240-2697.

9. Valhi, Inc., is a publicly traded company with its principal place of business in Dallas, Texas. Simmons, through his Contran holdings, controls more than 90% of Valhi. It may be served with process at 5430 LBJ Freeway, Suite 1700, Dallas, Texas, 75240-2697.

## IV.

## FACTS APPLICABLE TO ALL COUNTS

### A. Hollywood: Bright Lights in the Gaming Industry

10. Hollywood develops, owns, and operates distinctively themed casino entertainment facilities under the registered service mark "Hollywood Casino." Through its subsidiaries, Hollywood currently owns and operates: (a) a destination gaming resort located in Shreveport, Louisiana, approximately 180 miles east of Dallas; (b) a casino and entertainment facility in Aurora, Illinois, approximately 35 miles west of downtown Chicago; and (c) a casino, hotel, and entertainment complex in Tunica County, Mississippi, located approximately 30 miles south of Memphis, Tennessee. Each facility features the "Hollywood" theme, incorporating the glamour of the motion picture industry with designs inspired by famous movies and motion picture memorabilia.

### B. Jack Pratt: The Man Who Would Be King

11. Until recently, Jack Pratt served as Hollywood's Chairman of the Board of Directors and CEO.

12. On August 10, 2001, over his strong objections, the Board of Directors of Hollywood declined to reelect Jack Pratt as either Chairman of the Board or Chief Executive Officer. Significantly, it was the conclusion of the independent directors that Pratt's autocratic rule of the

Company had become destructive and required an end. For similar reasons, the Board also determined that Bill Pratt, Jack Pratt's longtime counselor, should not be reelected as General Counsel of the Company.

13. Since that time, Jack Pratt has joined forces with his longtime friend and corporate raider, Harold Simmons. Simmons has been described as a wolf hunting prey. As set forth below, there is no doubt that Simmons, Contran, and Valhi have combined with Jack and Bill Pratt to surreptitiously take control of Hollywood.

14. As of January 30, 2002, there were approximately 25 million shares of Hollywood Class A Common Stock outstanding. Jack Pratt owns slightly less than 4,110,500 shares. Pratt also holds sole or shared control over additional shares pursuant to various agreements relating to C.A. Pratt Partners, Ltd., Michael Eldon Pratt, Caroline de La Fontaine Pratt, and for certain other family beneficiaries.

## C. Harold Simmons: Corporate Raider With A Checkered Past

15. Simmons is well-known as a corporate raider with a no-holds barred philosophy. He is the Chairman and CEO of Contran.

16. Simmons began his career in the 1960's when he placed his company, University Pharmacy, into a trust and later sold it to the Eckerd Pharmacy chain for $50 million.

17. Although self-described as a "rags-to-riches success" story, Simmons is better known as a win-at-all-costs corporate raider with questionable ethics. Indeed, Simmons' background is littered with high profile battles thought to "push-the-envelope" of propriety.

18. In the 1970's, Simmons was prosecuted for mail and securities fraud by the U.S. Attorney in Chicago. Then, in 1983, Simmons was found to have violated pension fund laws.

19. Simmons also is a recidivist violator of federal election laws. In 1993, the Federal Election Commission fined him for exceeding federal contribution limits.

20. In 1997, Simmons' daughters alleged that Simmons secretly used their names on hundreds of thousands of dollars in political contributions. He also was accused of paying his daughter $1,000 for each blank political form contribution that she signed. In fact, Simmons admitted to forging his daughters' signatures to make political contributions to Senator Jesse Helms.

21. Not even his immediate family members have been immune from Simmons' questionable tactics. In a highly publicized Texas courtroom battle in late 1997, Simmons' daughters sought to legally remove Simmons as the Trustee of the Simmons Family Trusts, which together own almost all of Contran.

### D. <u>Contran: Takeover Conduit</u>

22. Contran is a holding company formed through Simmons' various hostile takeovers and acquisitions during the past two decades.

23. Simmons owns Contran through various family trusts in which he is the trustee. Simmons is Contran's Chairman and CEO.

24. Contran controls more than 90% of Valhi, Inc., which is publicly traded. Through subsidiaries and affiliates, Valhi conducts diversified operations relating to chemicals (NL Industries), titanium metals (Titanium Metals Corporation), waste management services (Waste Control Specialities), computer support systems, and precision ball bearing slides and locking systems (CompX International). In 2001, Valhi's revenues exceeded $950 million.

### E. Jack Pratt and Simmons Begin an Assault On Hollywood

25. Soon after the Board refused to reelect Jack Pratt as Chairman and CEO, Hollywood became aware that the Company's shares were being purchased at an unusually rapid pace. Indeed, significant blocks of Hollywood's publicly available shares were being purchased almost daily.

26. Hollywood also discovered that there was a standing order to purchase any additional Hollywood shares as they became available.

27. The sudden purchase of Hollywood shares and the standing order for additional shares was unusual. Hollywood's concern turned to alarm when it learned that its shares were being purchased by a single purchaser.

28. To make matters worse, Hollywood soon learned that the purchaser of Hollywood's shares and the standing order was by none other than Contran, Simmons' holding company.

29. Jack Pratt and Simmons are longtime friends. Indeed, because of Simmons' close affiliation with Jack and Bill Pratt, Simmons has been, and is, privy to Hollywood's confidential nonpublic information. As such, Simmons is an insider of Hollywood.

30. Shortly after it acquired the troubling information, the Company learned that Simmons, Jack Pratt, Bill Pratt, and others were working in concert to secretly purchase shares of Hollywood stock. In fact, the Company has also learned that Defendants have solicited others to join their group.

31. Despite their obligations as insiders to deal responsibly and in good faith vis-a-vis Hollywood and its shareholders, Defendants are acting in concert and for a common objective in violation of those duties. In addition, Defendants have used Hollywood's assets and confidential

information to enrich themselves and in pursuit of their scheme to surreptitiously take control of Hollywood.

32. As of the filing of this Complaint, Simmons, through his corporate affiliates, owned between 4% and 5% of Hollywood's shares. Yet based on their agreement, Simmons, Jack Pratt, Bill Pratt, and their group collectively own nearly 40% of Hollywood's shares.

### F. Defendants Operate Under A Cloak Of Secrecy, Violating Federal Securities Laws

33. Pursuant to 15 U.S.C. §78(d), any person who, individually, or acting as a "group" with one or more individual, directly owns 5% or more of the stock of a publicly traded company is required to file a Schedule 13D statement ("Schedule 13D") with the Securities & Exchange Commission ("SEC"), and forward it to the issuer.

34. The purpose of the Schedule 13D is to inform the marketplace so that purchasers and sellers of publicly available securities can make informed decisions regarding the identity and availability of shares of a public company.

35. Thus, the Schedule 13D requirement obligated Defendants to disclose their (1) identity and background; (2) purpose in acquiring Hollywood shares; (3) sources of funding; (4) arrangements or contracts with other persons concerning the stock; and (5) any other material information.

36. Defendants failed to do so even though they collectively own nearly 40% of Hollywood's shares.

### G.     The Damage Done

37.     As a result of Defendants' failure to file a Schedule 13D, the investment community has been, and continues to be, misinformed.

38.     Public shareholders are entitled, among other things, to know Defendants' identity, qualifications, and intentions. Moreover, Jack Pratt's recently filed Schedule 13D fails to disclose that he is acting in concert with Simmons, Bill Pratt, and others.

39.     To the contrary, Jack Pratt's December 31, 2001 Schedule 13D "expressly disclaims the existence of any 'group' within the meaning of Section 13(d)(3)."

40.     Bill Pratt filed his most recent Schedule 13D on December 29, 1998. At that time, he represented that he owned 5.4% of Hollywood's stock.

41.     Bill Pratt's Schedule 13D also "expressly disclaim[s] the existence of any 'group' within the meaning of Section 13(d)(3)." Even if this representation was true when made in 1998, it is false and misleading in 2002 and Bill Pratt should have filed an amendment disclosing his group.

42.     Defendants' acts and omissions are particularly egregious given their firsthand knowledge of the harm their scheme may cause Hollywood. Pursuant to relevant gaming and casino laws in Louisiana, Illinois, and Mississippi, Hollywood must obtain licenses to operate their facilities. In Louisiana, for example, the relevant gaming and casino statutes require that any person who has or controls, directly or indirectly, 5% or more of an interest in an entity licensed to operate a casino, or who has the ability (in the Louisiana Gaming Control Board's opinion) to exercise significant influence over a licensee, must meet suitability qualifications and requirements.

43. In Illinois, the relevant gaming and casino statutes require that any person with an ownership interest or voting rights of more than 5% in an Illinois license, or who is deemed by the Illinois Gaming Board to hold a position or level of ownership, control, or influence that is material to the regulatory concerns and obligation of the Illinois Gaming Board, must be approved as a key person.

44. To satisfy these suitability standards or obtain approval as a key person, an individual must possess, among other things, good character, honesty, and integrity. In addition, the standards take into consideration prior activities, any criminal record, reputation, and habits. A license can be revoked if a controlling person has been convicted or otherwise admits to offenses involving, but not limited to, fraud or attempted fraud and false statements.

45. Similarly, pursuant to the relevant gaming and casino statutes in Illinois, the State, in determining whether an entity is eligible for a license, will consider the character, reputation, experience, and financial integrity of a person that controls, directly or indirectly, the casino operator-licensee.

46. Strict compliance with state gaming regulations by Hollywood, its managers, and certain shareholders is necessary in order to maintain Hollywood's valuable licenses. As set forth above, Simmons' background and associations will likely render him detrimental to Hollywood.

47. Accordingly, Plaintiff files this complaint for a temporary restraining order and a preliminary injunction: (1) compelling Defendants to file an accurate Schedule 13D that specifically identifies their group; (2) enjoining Defendants from purchasing, acquiring, or otherwise obtaining Hollywood securities until they file a true and accurate "group" Schedule 13D; (3) requiring Defendants to divest any and all Hollywood shares acquired prior to their filing of an accurate

Schedule 13D; and (4) prohibiting all Defendants from voting any shares purchased or otherwise obtained on or after August 10, 2001, the date that Jack and Bill Pratt were not reelected to their officer positions at Hollywood.

48. Defendants' acts and omissions were, and continue to be, false, manipulative, and misleading. If Defendants are permitted to continue to acquire Hollywood shares in an improper manner to gain control of Hollywood, the Company and its shareholders will likely be irreparably harmed.

49. Plaintiff has no adequate remedy at law.

## V.

## CLAIMS

### A. Count One: Injunctive Relief For Failure to File A "Group" Schedule 13D

50. Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs.

51. Defendants have implicitly or explicitly agreed to act together for the purposes of acquiring, holding, voting, and/or disposing of Hollywood securities. Together, Defendants have acquired 5% or more of a class of registered securities of Hollywood.

52. Because Defendants' group has acquired 5% or more of a class of Hollywood's securities, Defendants were and are required to send to Hollywood, and to file with the SEC an accurate Schedule 13D setting forth, *inter alia*, Defendants' identity and their purposes for acquiring the stock.

53. Defendants's group failed to send to Hollywood and file with the SEC, an accurate Schedule 13D.

54. As a result of Defendants' failure to file an accurate Schedule 13D, the investing public has been, and will continue to be, misinformed. Moreover, unless and until Defendants file an accurate Schedule 13D, the investment community will not have the necessary access to full and fair disclosure of pertinent information regarding Defendants' intentions and thus will be unable to make informed decisions whether to tender their stock.

55. Accordingly, Plaintiff seeks a temporary restraining order and preliminary injunction against Defendants: (1) compelling Defendants to file an accurate "group" Schedule 13D; (2) enjoining Defendants from purchasing, acquiring, or otherwise obtaining Hollywood securities until they file an accurate Schedule 13D; (3) requiring Defendants to divest any shares acquired prior to filing an accurate Schedule 13D; and (4) prohibiting all Defendants from making a tender offer for outstanding Hollywood securities.

56. Plaintiff will suffer irreparable harm if Defendants continue to purchase Hollywood stock in violation of federal securities law. Plaintiff accordingly seeks a temporary restraining order barring Defendants from making such purchases. For the reasons set forth above, Plaintiff is likely to succeed on the merits.

**B.** **Count Two: Injunctive Relief For Filing An Inaccurate Schedule 13D**

57. As noted, Defendants failed to send to Hollywood and file with the SEC an accurate "group" Schedule 13D.

58. On December 31, 2001, however, Jack Pratt did send to Hollywood and file with the SEC a Schedule 13D on his own behalf. However, Jack Pratt's Schedule 13D contained false and misleading information.

59. In Item 5 –"Interest in Securities of the Issuer"– Jack Pratt stated: "The Reporting Persons hereby expressly disclaim the existence of any 'group' within the meaning of Section 13(d)(3) of the Securities Exchange Act of 1934, as amended between themselves or with any other person, with respect to the [Hollywood] stock."

60. As set forth above, this statement was knowingly false when made. Jack Pratt is a member of a group that includes, at the very least, Simmons and Bill Pratt.

61. Furthermore, in Item 4 – "Purpose of the Transaction" – Jack Pratt stated:

> The reporting Persons *initially acquired the securities herein reported for investment purposes*. In the future the Reporting persons *may or may not use their interest in the Company to take or support one or more of the following actions*: (a) the acquisition or disposition, by any person, of additional securities of the Company; (b) an *extraordinary corporate transaction*, such as a *merger reorganization or liquidation*, involving the Company or any of its subsidiaries; (c) a sale or transfer of a material amount of assets of the Company or any of its subsidiaries; (d) any *change in the present board of directors or management* of the Company, including any plans or proposals to change the number or term of directors to fill any existing vacancies on the board of directors; (e) any material change in the present capitalization or dividend policy of the Company; (f) any other material change to the Company's business or corporate structure; (g) changes in the Company's charter or bylaws; (h) causing the Common Stock or any other class of securities of the Company to become eligible for termination of registration to Section 12(g)(4) of the Securities Exchange Act of 1934, as amended; or (j) any action similar to any of those enumerated above.

(Emphasis added.)

62. Given Defendants' conduct to date and their obvious intentions, this broad statement is materially misleading.

63. Bill Pratt's most recent Schedule 13D was filed as of December 29, 1998. It "expressly disclaim[ed] the existence of any 'group' within the meaning of Section 13(d)(3)."

64. Given this disclaimer, Bill Pratt had an affirmative obligation to amend his individual Schedule 13D as soon as he, Jack Pratt, Simmons, and/or others became a group.

65. At that same time, Bill Pratt also was required to file a "group" Schedule 13D. He failed to and still has not done so.

### C. Count Three: Injunctive Relief For Defendants' Violations of § 14(e) of the Securities Exchange Act and SEC Rule 14e-3

66. Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs.

67. Pursuant to § 14(e) of the Securities Exchange Act, it is unlawful for any person to engage in any fraudulent, deceptive, or manipulative acts or practices in connection with any tender offer or request or invitation for tenders.

68. Pursuant to SEC Rule 14e-3, it is a fraudulent, deceptive, or manipulative act – and thus, unlawful – for a person to purchase or sell securities based upon material information relating to a commenced or about to be commenced tender offer, where the person knows or has reason to know that the information regarding the tender offer is nonpublic, and which he knows has been acquired directly or indirectly from the offering person, the issuer of the securities sought or to be sought by such tender offer, or any officer, director, partner, or employee or any other person acting on behalf of the offering person or the issuer.

69. To the extent that Defendants have commenced a "creeping" tender offer, Defendants violated Rule 14e-3 by, *inter alia,* knowingly purchasing shares of Hollywood stock based upon

material information obtained from Jack Pratt and Bill Pratt, a director and former officers of Hollywood. Defendants knew or had reason to know that the information was nonpublic and material.

70. If Defendants continue to purchase Hollywood shares based upon such nonpublic information, Plaintiff, its shareholders, and the investing public will suffer irreparable harm. Accordingly, Plaintiff seeks a temporary restraining order to enjoin Defendants from purchasing Hollywood shares. For the reasons set forth above, Plaintiff is likely to succeed on the merits.

### D. Count Four: Aiding and Abetting Breach of Fiduciary Duty

71. Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs.

72. Simmons, Contran, and Valhi have aided and abetted Jack and Bill Pratt to breach their fiduciary duties by, among other things, acquiring, purchasing, or otherwise obtaining Hollywood's securities based on non-public and confidential information.

73. Defendants have joined together to accomplish an unlawful purpose or to accomplish a lawful purpose through unlawful means.

74. As a result of this wrongful conduct, Hollywood has suffered damages in an amount to be determined by the trier of fact.

75. Because Defendants' acts were committed knowingly, intentionally, and with reckless and conscious disregard for the rights of Plaintiff, Plaintiff also seeks punitive damages in an amount to be determined by the trier of fact.

### E. Count Five: Conspiracy to Breach Fiduciary Duty

76. Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs.

77. Defendants have conspired together to purchase, acquire, or otherwise obtain – directly or indirectly – shares of Hollywood Casino securities based on inside information known by Jack and Bill Pratt through their positions as a former officers and current directors of Hollywood. Defendants' wrongful conduct is a violation of federal securities laws.

78. Defendants have conspired with each other to accomplish an unlawful purpose or to accomplish a lawful purpose through unlawful means.

79. Jack and Bill Pratt's unlawful conduct is a breach of their fiduciary duties as directors, former officers, and insiders of Hollywood.

80. As a result of this conspiracy, Hollywood has suffered damages in an amount to be determined by the trier of fact.

81. Furthermore, because Defendants' acts were committed knowingly, intentionally, and with reckless and conscious disregard for the rights of Hollywood, Hollywood also seeks punitive damages in an amount to be determined by the trier of fact.

## VI.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

    a. an order compelling Defendants to file a complete and accurate "group" Schedule 13D;

b. an order enjoining Defendants from purchasing, acquiring, or otherwise obtaining any additional Hollywood securities until they file an accurate Schedule 13D;

c. an order requiring Defendants to divest any Hollywood securities they acquired prior to filing an accurate "group" Schedule 13D;

d. an order enjoining Defendants from voting any shares obtained on or after August 10, 2001;

e. an order enjoining Defendants from making a tender offer for outstanding Hollywood securities;

f. an award of damages to compensate Plaintiff for the harm caused by Defendants' wrongful and tortious conduct and breaches of fiduciary duty;

g. an award of exemplary damages for Defendants' intentional, wrongful, and tortious conduct;

h. an assessment of reasonable costs and attorneys' fees; and

i. such other and further relief as this Court deems just and proper.

## VII.

## JURY DEMAND

Plaintiff requests a jury trial on all questions of fact or combined questions of law and fact raised by this complaint.

Dated: February ___, 2002

Respectfully submitted,

**BICKEL & BREWER**

By: _/s/ Daniel S. York_

William Brewer III
State Bar No. 02967035
James S. Renard
State Bar No. 1678500
Daniel S. York
State Bar No. 00786774

1717 Main St., Suite 4800
Dallas, Texas 75201
Telephone:     (214) 653-4000
Telecopier:    (214) 653-1015

**ATTORNEYS FOR PLAINTIFFS
HOLLYWOOD CASINO CORPORATION**