

ORIGINAL

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**FILED**

APR 9 2002

CLERK, U.S. DISTRICT COURT

By _____
      Deputy

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| HOLLYWOOD CASINO CORPORATION, | § | |
| | § | |
| | § | |
| Plaintiff, | § | Civil Action No. 3-02CV0325-M |
| | § | |
| v. | § | |
| | § | |
| HAROLD C. SIMMONS, | § | **FIRST AMENDED** |
| CONTRAN CORPORATION, | § | **COMPLAINT AND** |
| VALHI, INC., JACK E. PRATT, | § | **JURY DEMAND** |
| and WILLIAM D. PRATT, | § | |
| | § | |
| Defendants. | § | |

Plaintiff Hollywood Casino Corporation ("Plaintiff" or "Hollywood") files this First Amended Complaint and Jury Demand against Harold C. Simmons ("Simmons"), Contran Corporation ("Contran"), Valhi, Inc. ("Valhi") (Simmons, Contran and Valhi are collectively "the Simmons Defendants"), Jack E. Pratt ("Jack Pratt"), and William D. Pratt ("Bill Pratt") (collectively "defendants"), on personal knowledge as to their own acts, and upon information and belief as to all others, as follows:

## I.

## PRELIMINARY STATEMENT

This action is filed to protect Plaintiff from defendants' covert assault on Hollywood, a publicly-traded corporation. Despite clear proscriptions against such activity, defendants have joined together in an effort to surreptitiously obtain control of Hollywood. Defendants' blatant violations of federal securities laws must be stopped. Accordingly, Hollywood files this action to protect itself and its shareholders, and to recover profits made on sales of stock by insiders.



## II.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa because this is a civil action arising under the federal securities laws.  This Court has supplemental jurisdiction over Hollywood's common law claims pursuant to 28 U.S.C. § 1367(a).

2.      This Court has personal jurisdiction over defendants because defendants reside in, or regularly transact business in, the State of Texas.

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because it is a judicial district where defendants reside and/or where a substantial part of the events or omissions giving rise to the claims asserted herein occurred.

## III.

## PARTIES

A.      **Plaintiff**

4.      Hollywood is a publicly-traded corporation organized and existing under the laws of the State of Delaware with its principal place of business in Dallas, Texas.

B.      **Defendants**

5.      Jack Pratt is a member of Hollywood's Board of Directors.  Jack Pratt may be served with process at 5055 Park Lane, Dallas, Texas, 75220.

6.      Bill Pratt is a member of Hollywood's Board of Directors.  He may be served with process at 14710 Celestial Place, Addison, Texas, 75254.

7.      Simmons is an individual residing in Dallas, Texas.  Simmons may be served with process at 5430 LBJ Freeway, Suite 1700, Dallas, Texas, 75240-2697.

8.    Contran, a corporation formed under the laws of the State of Delaware, is a holding company with its principal place of business in Dallas, Texas.  Contran may be served with process at 5430 LBJ Freeway, Suite 1700, Dallas, Texas, 75240-2697.

9.    Valhi, Inc., is a publicly traded company with its principal place of business in Dallas, Texas.  Simmons, through his Contran holdings, controls more than 90% of Valhi.  It may be served with process at 5430 LBJ Freeway, Suite 1700, Dallas, Texas, 75240-2697.

## IV.

## FACTS APPLICABLE TO ALL COUNTS

### A.    Hollywood:  Bright Lights In The Gaming Industry

10.   Hollywood develops, owns, and operates distinctively themed casino entertainment facilities under the registered service mark "Hollywood Casino."   Through its subsidiaries, Hollywood currently owns and operates:  (a) a destination gaming resort located in Shreveport, Louisiana, approximately 180 miles east of Dallas; (b) a casino and entertainment facility in Aurora, Illinois, approximately 35 miles west of downtown Chicago; and (c) a casino, hotel, and entertainment complex in Tunica County, Mississippi, located approximately 30 miles south of Memphis, Tennessee.  Each facility features the "Hollywood" theme, incorporating the glamour of the motion picture industry with designs inspired by famous movies and motion picture memorabilia.

### B.    Jack Pratt:  The Man Who Would Be King

11.   Until recently, Jack Pratt served as Hollywood's Chairman of the Board of Directors and CEO.

12.   As Chairman and CEO, Jack Pratt had virtually unlimited access to information about Hollywood, including confidential information relating to Hollywood's, finances, operations, and future plans.

13.    On August 10, 2001, over his protest, the Board of Directors of Hollywood declined to reelect Jack Pratt as either Chairman of the Board or Chief Executive Officer. Significantly, it was the conclusion of the independent directors that Pratt's autocratic rule of Hollywood had become destructive and required an end. For similar reasons, the Board also determined that Bill Pratt, Jack Pratt's longtime counselor, should not be reelected as General Counsel of Hollywood.

14.    Since that time, Jack Pratt has joined forces with his longtime friend and corporate raider, Harold Simmons. Simmons (often described as a "wolf hunting prey") and his affiliates, the Simmons Defendants, have now formed a group with Jack and Bill Pratt to take control of Hollywood and reap profits in the manipulation of Hollywood's share price.

15.    As of January 30, 2002, there were approximately 25 million shares of Hollywood Class A Common Stock outstanding. Jack Pratt owns slightly less than 4,110,500 shares. Pratt also holds sole or shared control over additional shares pursuant to various agreements relating to C.A. Pratt Partners, Ltd., Michael Eldon Pratt, Caroline de La Fontaine Pratt, and for certain other family beneficiaries.

## C.    Harold Simmons:  Corporate Raider With A Checkered Past

16.    Simmons is well-known as a corporate raider with a no-holds barred philosophy. He is the Chairman and CEO of Contran.

17.    Simmons began his career in the 1960's when he placed his company, University Pharmacy, into a trust and later sold it to the Eckerd Pharmacy chain for $50 million.

18.    Although self-described as a "rags-to-riches success" story, Simmons is better known as a win-at-all-costs corporate raider with questionable ethics. Indeed, Simmons' background is littered with high profile battles thought to "push-the-envelope" of propriety. Simmons has

previously also launched attempts to take over companies and purchased and sold large blocks of shares in potential takeover targets.

19.     In the 1970's, Simmons was prosecuted for mail and securities fraud by the U.S. Attorney in Chicago. Then, in 1983, Simmons was found to have violated pension fund laws.

20.     Simmons also is a recidivist violator of federal election laws. In 1993, the Federal Election Commission fined him for exceeding federal contribution limits.

21.     In 1997, Simmons' daughters alleged that Simmons secretly used their names on hundreds of thousands of dollars in political contributions. He also was accused of paying his daughter $1,000 for each blank political form contribution that she signed. In fact, Simmons admitted to forging his daughters' signatures to make political contributions to Senator Jesse Helms.

22.     Not even his immediate family members have been immune from Simmons' questionable tactics. In a highly publicized Texas courtroom battle in late 1997, Simmons' daughters sought to legally remove Simmons as the Trustee of the Simmons Family Trusts, which together own almost all of Contran.

**D.     Contran:  Takeover Conduit**

23.     Contran is a holding company formed through Simmons' various hostile takeovers and acquisitions during the past two decades.

24.     Simmons is the beneficial owner of and controls Contran through various family trusts in which he is the trustee. Simmons is Contran's Chairman and CEO.

25.     Contran controls more than 90% of Valhi, Inc., which is publicly traded. Through subsidiaries and affiliates, Valhi conducts diversified operations relating to chemicals (NL Industries), titanium metals (Titanium Metals Corporation), waste management services (Waste

Control Specialities), computer support systems, and precision ball bearing slides and locking systems (CompX International). In 2001, Valhi's revenues exceeded $950 million.

**E.    Jack Pratt and Simmons Begin An Assault On Hollywood**

26.    Soon after the Board refused to reelect Jack Pratt as Chairman and CEO, Hollywood became aware that Hollywood's shares were being purchased at an unusually rapid pace. Indeed, significant blocks of Hollywood's publicly available shares were being traded almost daily.

27.    Hollywood also discovered that there was a standing order to purchase any additional Hollywood shares as they became available. Hollywood recognized that these types of stock purchases did not comport with historical trends.

28.    The sudden purchase of Hollywood shares and the standing order for additional shares were quite unusual. Hollywood's concern turned to alarm when it learned that its shares were being purchased by a single purchaser.

29.    Hollywood management investigated this trend. To make matters worse, Hollywood soon learned that the purchaser of Hollywood's shares and the standing order was by none other than the Simmons Defendants.

30.    Jack Pratt and Simmons are longtime friends and communicate frequently. In fact, Jack Pratt treated Simmons to lavish meals and received reimbursement from Hollywood, even when there was no legitimate business purpose. Jack Pratt also "hosted" Simmons and his wife in the corporate jet utilized by Hollywood without a business purpose.

31.    In fact, Jack Pratt early on informed his friends and others of his plan to conduct a proxy fight for control of Hollywood. Jack Pratt informed several of his friends that he had formed a group and that they had been purchasing shares in order to take over Hollywood, and reinstall himself as Chairman.

32.    Jack Pratt has also requested to inspect various records and documents of Hollywood in order to communicate with stockholders regarding their investment, including to communicate with stockholders concerning the election of directors and a possible proxy solicitation relating to the election of directors at the 2002 annual stockholders' meeting.

33.    The Simmons Defendants have been and are privy to Jack Pratt's confidential, nonpublic information regarding Hollywood, including confidential information relating to Hollywood's future plans, proposals, results of operations, and a broad range of financial and operational data.

34.    Because of the foregoing, Simmons is an insider of Hollywood.  The Simmons Defendants have thus entered into an agreement and understanding with Jack Pratt and Bill Pratt relating to the holding, voting or disposing of Hollywood securities.

35.    After Hollywood received this information about Jack Pratt and the Simmons Defendants, Plaintiff learned that the Simmons Defendants, Jack Pratt, and Bill Pratt were likely working with others to secretly purchase shares of Hollywood stock. Jack and Bill Pratt thus conspired with the Simmons Defendants and likely others to accomplish their goals.

36.    Despite their obligations as insiders to deal responsibly and in good faith vis-a-vis Hollywood and its shareholders, defendants are acting in concert and for a common objective in violation of those duties.  They formed a group whose purpose is to facilitate a proxy contest or make a tender offer.

37.    In addition, defendants have used Hollywood's assets and confidential information to enrich themselves and in pursuit of their scheme to take control of Hollywood.

38.   As of the filing of the original Complaint, Simmons, through his corporate affiliates, owned between 4% and 5% of Hollywood's shares.  Based on their agreement, Simmons, Jack Pratt, Bill Pratt, and their group collectively owned nearly 40% of Hollywood's shares.

**F.   Defendants Operate Under A Cloak Of Secrecy, Violating Federal Securities Laws**

39.   Pursuant to 15 U.S.C. §78(d), any person who individually or acting as a "group" with one or more individuals is the beneficial owner, directly or indirectly, of 5% or more of the stock of a publicly traded company is required to file a Schedule 13D statement ("Schedule 13D") with the Securities & Exchange Commission ("SEC"), and forward it to the issuer.

40.   Regardless of the manner, the Simmons Defendants, Jack Pratt, and Bill Pratt are linked by a desire to profit from a shift in corporate control by covert means at Hollywood's shareholders' expense, most likely through a proxy contest or a tender offer.

41.   The purpose of the Schedule 13D is to inform the marketplace so that purchasers and sellers of publicly available securities can make informed decisions regarding the identity and availability of shares of a public company.

42.   Thus, the Schedule 13D requirement obligated defendants to disclose (1) their identity and background; (2) their purpose in acquiring Hollywood shares; (3) sources of funding; (4) arrangements or contracts with other persons concerning the stock; and (5) any other material information.

43.   At the time the group was formed, Jack Pratt was operating under a Schedule 13D dated as of December 29, 1998.  It stated, "Reporting Persons hold their respective shares of Common Stock for *investment purposes*." (Emphasis added.)  Defendant continued: "Reporting persons reserve the right to acquire additional securities of the company, to dispose of those

securities at any time, or to formulate other purposes, plans or proposals regarding the company or securities to the extent available . . . ."

44.    Federal law and SEC regulations required Jack Pratt, Bill Pratt, Simmons, Contran, and Valhi to amend or file their Schedule 13Ds and disclose their intentions as soon as circumstances changed. Instead, they ignored the Schedule 13D requirement and banded together to coordinate an attack on Hollywood.

45.    Jack Pratt's most recent Schedule 13D, dated as of December 31, 2001, fails to disclose his plans or intentions, and thus contains deliberately untrue and misleading statements. In that filing, Jack Pratt stated that "the Reporting persons *may or may not* use their interest in the Company to take or support *one or more*" of ten (10) broadly worded possible actions. (Emphasis added.)

## G.    The Damage Done

46.    As a result of defendants' failure to file a Schedule 13D, the investment community and Hollywood's shareholders have been, and continue to be, misinformed.

47.    Public shareholders are entitled, among other things, to know defendants' identity, qualifications, and intentions. Moreover, Jack Pratt's recently filed Schedule 13D fails to disclose that he is acting in concert with Simmons, Bill Pratt, and others.

48.    To the contrary, Jack Pratt's December 31, 2001 Schedule 13D "expressly disclaims the existence of any 'group' within the meaning of Section 13(d)(3)."

49.    Bill Pratt filed his most recent Schedule 13D on December 29, 1998. At that time, he represented that he owned 5.4% of Hollywood's stock.

50.    Bill Pratt's Schedule 13D also "expressly disclaim[s] the existence of any 'group' within the meaning of Section 13(d)(3)." Even if this representation was true when made in 1998,

it is false and misleading at the present time, and Bill Pratt should have filed an amendment disclosing his group.

51.     Defendants' acts and omissions are particularly egregious given their firsthand knowledge of the harm their scheme may cause Hollywood. Pursuant to relevant gaming and casino laws in Louisiana, Illinois, and Mississippi, Hollywood must obtain licenses to operate their facilities. In Louisiana, for example, the relevant gaming and casino statutes require that any person who has or controls, directly or indirectly, 5% or more of an interest in an entity licensed to operate a casino, or who has the ability (in the Louisiana Gaming Control Board's opinion) to exercise significant influence over a licensee, must meet suitability qualifications and requirements.

52.     In Illinois, the relevant gaming and casino statutes require that any person with an ownership interest or voting rights of more than 5% in an Illinois license, or who is deemed by the Illinois Gaming Board to hold a position or level of ownership, control, or influence that is material to the regulatory concerns and obligation of the Illinois Gaming Board, must be approved as a key person.

53.     To satisfy these suitability standards or obtain approval as a key person, an individual must possess, among other things, good character, honesty, and integrity. In addition, the standards take into consideration prior activities, any criminal record, reputation, and habits. A license can be revoked if a controlling person has been convicted or otherwise admits to offenses involving, but not limited to, fraud or attempted fraud and false statements.

54.     Similarly, pursuant to the relevant gaming and casino statutes in Illinois, the State, in determining whether an entity is eligible for a license, will consider the character, reputation, experience, and financial integrity of a person that controls, directly or indirectly, the casino operator-licensee.

**HOLLYWOOD CASINO CORPORATION'S FIRST**
**AMENDED COMPLAINT AND JURY DEMAND**                                    **Page 10**

55.     Strict compliance with state gaming regulations by Hollywood, its managers, and certain shareholders is necessary in order to maintain Hollywood's valuable licenses. As set forth above, Simmons' background and associations will likely render him detrimental to Hollywood.

56.     Accordingly, Plaintiff files this complaint for a temporary restraining order and a preliminary injunction: (1) compelling defendants to file an accurate Schedule 13D that specifically identifies their group; (2) enjoining defendants from purchasing, acquiring, or otherwise obtaining Hollywood securities until they file a true and accurate "group" Schedule 13D; (3) requiring defendants to divest any and all Hollywood shares acquired prior to their filing of an accurate Schedule 13D; and (4) prohibiting all defendants from voting any shares purchased or otherwise obtained on or after August 10, 2001, the date that Jack and Bill Pratt were not reelected to their officer positions at Hollywood.

57.     Defendants' acts and omissions were, and continue to be, false, manipulative, and misleading. If defendants are permitted to continue to acquire Hollywood shares in an improper manner to gain control of Plaintiff, Hollywood and its shareholders will likely be irreparably harmed.

58.     Plaintiff has no adequate remedy at law for the incomplete disclosures of Jack Pratt, Bill Pratt and the Simmons Defendants.

## H.     The Proverbial Rats And a Sinking Ship

59.     At the time the Simmons Defendants were purchasing Hollywood stock, the stock price was lower than the price at the time the Simmons Defendants were selling Hollywood shares. For example, Hollywood stock closed at $8.40 on November 9, 2001 and at $15.45 at closing on April 5, 2002 – an increase of nearly 85%.

60.　Plaintiff has learned that the Simmons Defendants have sold Hollywood stock after the original Complaint was filed in February 2002, and have earned a profit on their purchases and sales of Hollywood stock.

61.　Plaintiff also seeks the disgorgement of all profits made on the purchase and sale of Hollywood stock by Hollywood insiders (including the Simmons Defendants) within any six-month period.  If Plaintiff learns that other friends of Jack Pratt were encouraged to purchase Hollywood shares and have earned an illegal profit on those shares as a result of the recent appreciation in Hollywood's share price, Hollywood will similarly sue those persons for those profits.

## V.

## CLAIMS

### A.　Count One:  Injunctive Relief For Failure to File A "Group" Schedule 13D

62.　Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs.

63.　Defendants have implicitly or explicitly agreed to act together for the purposes of acquiring, holding, voting, and/or disposing of Hollywood securities.  Together, defendants have acquired 5% or more of a class of registered securities of Hollywood.

64.　Because defendants' group has acquired 5% or more of a class of Hollywood's securities, defendants were and are required to send to Hollywood, and to file with the SEC, an accurate Schedule 13D setting forth, *inter alia,* defendants' identity and their purposes for acquiring the stock.

65.　Defendants' group failed to send to Hollywood and file with the SEC, an accurate Schedule 13D.

66.     As a result of defendants' failure to file an accurate Schedule 13D, the investing

public has been, and will continue to be, misinformed. Moreover, unless and until defendants file

an accurate Schedule 13D, the investment community will not have the necessary access to full and

fair disclosure of pertinent information regarding defendants' intentions, and thus will be unable to

make informed decisions whether to tender their stock.

67.     Accordingly, Plaintiff seeks a temporary restraining order and preliminary injunction

against defendants: (1) compelling defendants to file an accurate "group" Schedule 13D;

(2) enjoining defendants from purchasing, acquiring, or otherwise obtaining Hollywood securities

until they file an accurate Schedule 13D; (3) requiring defendants to divest any shares acquired prior

to filing an accurate Schedule 13D; and (4) prohibiting all defendants from making a tender offer for

outstanding Hollywood securities.

68.     Plaintiff will suffer irreparable harm if defendants continue to purchase Hollywood

stock in violation of federal securities law. Plaintiff accordingly seeks a temporary restraining order

barring defendants from making such purchases. For the reasons set forth above, Plaintiff is likely

to succeed on the merits.

**B.      Count Two:  Injunctive Relief For Filing An Inaccurate Schedule 13D**

69.     Plaintiff realleges and incorporates the allegations set forth in the preceding

paragraphs.

70.     Jack Pratt was required to amend his December 29, 1998 Schedule 13D as soon as

the purpose of the transaction was not for investment purposes, but failed to do so. Other

defendants, including Bill Pratt, Simmons, Contran, and Valhi also were required to disclose their

stock holdings and intentions by filing or amending the appropriate Schedule 13D and filing a

"group" Schedule 13D.

71.     On December 31, 2001, however, Jack Pratt did send to Hollywood and file with the

SEC a Schedule 13D on his own behalf.  However, Jack Pratt's Schedule 13D contained false and

misleading information.

72.     In Item 5 –"Interest in Securities of the Issuer"– Jack Pratt stated:  "The Reporting

Persons hereby expressly disclaim the existence of any 'group' within the meaning of Section

13(d)(3) of the Securities Exchange Act of 1934, as amended, between themselves or with any other

person, with respect to the [Hollywood] Stock."

73.     As set forth above, this statement was knowingly false when made.  Jack Pratt is a

member of a group that includes, at the very least, Simmons and Bill Pratt.

74.     Furthermore, in Item 4 -- "Purpose of the Transaction" – Jack Pratt stated:

> The reporting Persons *initially acquired the securities herein reported for investment purposes*.  In the future the Reporting persons *may or may not use their interest in the Company to take or support one or more of the following actions*: (a) the acquisition or disposition, by any person, of additional securities of the Company; (b) an *extraordinary corporate transaction*, such as a *merger reorganization or liquidation*, involving the Company or any of its subsidiaries; (c) a sale or transfer of a material amount of assets of the Company or any of its subsidiaries; (d) any *change in the present board of directors or management* of the Company, including any plans or proposals to change the number or term of directors to fill any existing vacancies on the board of directors; (e) any material change in the present capitalization or dividend policy of the Company; (f) any other material change to the Company's business or corporate structure; (g) changes in the Company's charter or bylaws; (h) causing the Common Stock or any other class of securities of the Company to become eligible for termination of registration to Section 12(g)(4) of the Securities Exchange Act of 1934, as amended; or (j) any action similar to any of those enumerated above.

(Emphasis added.)

75.     Given defendants' conduct to date and their obvious intentions, this broad statement

is materially misleading.

76.     Bill Pratt's most recent Schedule 13D was filed as of December 29, 1998. It "expressly disclaim[ed] the existence of any 'group' within the meaning of Section 13(d)(3)."

77.     Given this disclaimer, Bill Pratt had an affirmative obligation to amend his individual Schedule 13D as soon as he, Jack Pratt, Simmons, Contran, Valhi, and/or others became a group.

78.     At that same time, Bill Pratt also was required to file a "group" Schedule 13D. He failed to and still has not done so. Furthermore, Simmons, Contran, or Valhi has also failed to fulfill their reporting obligations regarding the existence of the group and their plan for Hollywood.

**C.     Count Three: Injunctive Relief For Defendants' Violations of § 14(e) of the Securities Exchange Act and SEC Rule 14e-3**

79.     Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs.

80.     Pursuant to § 14(e) of the Securities Exchange Act, it is unlawful for any person to engage in any fraudulent, deceptive, or manipulative acts or practices in connection with any tender offer or request or invitation for tenders.

81.     Pursuant to SEC Rule 14e-3, it is a fraudulent, deceptive, or manipulative act – and thus, unlawful – for a person to purchase or sell securities based upon material information relating to a commenced or about to be commenced tender offer, where the person knows or has reason to know that the information regarding the tender offer is nonpublic, and which he knows has been acquired directly or indirectly from the offering person, the issuer of the securities sought or to be sought by such tender offer, or any officer, director, partner, or employee or any other person acting on behalf of the offering person or the issuer.

82.     Because the defendants have commenced a "creeping" tender offer, they have violated Rule 14e-3 by, *inter alia,* knowingly purchasing shares of Hollywood stock based upon material

**HOLLYWOOD CASINO CORPORATION'S FIRST
AMENDED COMPLAINT AND JURY DEMAND**                                    **Page 15**

information obtained from Jack Pratt and Bill Pratt, directors and former officers of Hollywood. Defendants knew or had reason to know that the information was nonpublic and material.

83.    If defendants continue to purchase Hollywood shares based upon such nonpublic information, Plaintiff, its shareholders, and the investing public will suffer irreparable harm.   Accordingly, Plaintiff seeks a temporary restraining order to enjoin defendants from purchasing Hollywood shares.   For the reasons set forth above, Plaintiff is likely to succeed on the merits.

**D.    Count Four: Injunctive Relief And Monetary Damages For Defendants' Violations Of § 14(a) Of The Securities Exchange Act And SEC Rule 14a-9**

84.    Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs.

85.    Pursuant to § 14(a) of the Securities Exchange Act, it is unlawful for any person to solicit or to permit the use of such person's name to solicit any proxy or consent or authorization regarding any security in violation of SEC rules.

86.    SEC Rule 14a-9 further provides that no solicitation shall be made by any proxy statement, form of proxy, notice of meeting, or other communication containing any statement that at the time and under the circumstances in which it is made, is false or misleading regarding any material fact, or omits to state any material fact necessary to make the statements not false, misleading, or necessary to correct any statement in any earlier communication relating to or regarding the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

87.    The purpose of Section 14(a) is to prevent parties from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitations.

88.     Defendants have violated Section 14(a) and Rule 14a-9 and will continue to do so if not enjoined.  If defendants continue to purchase Hollywood shares based upon such nonpublic information, Plaintiff, its shareholders, and the investing public will suffer irreparable harm. Accordingly, Plaintiff seeks an injunction prohibiting defendants from making public statements or soliciting proxies for Hollywood's 2002 Annual Meeting of Stockholders until such time as they have complied with all requirements of Section 14(a) and the SEC Rules promulgated thereunder.

89.     Furthermore, because defendants have violated Section 14(a), Hollywood is entitled to an award of damages to compensate it for defendants' wrongdoing.

## E.     Count Five: Injunctive Relief For Defendants' Violations Of SEC Rules 14a-3 And 14a-6

90.     Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs.

91.     SEC Rule 14a-3 requires that certain information be furnished to security holders with respect to the solicitation of proxies.  These requirements include (1) shareholders being "concurrently furnished with a publicly filed preliminary or definitive written proxy statement;" (2) the proxy solicitor mailing copies to the SEC; and (3) the solicitor preparing an Annual Report to security holders.

92.     Defendants have not followed these and other procedures and requirements set forth in Rule 14a-3.

93.     SEC Rule 14a-6 relates to preliminary proxy statements.  It requires, with exceptions, that "preliminary copies of the proxy statement and form of proxy shall be filed with the Commission at least ten (10) calendar days prior to the date definitive copies of such material are first sent or give to security holder."

94.     Rule 14a-6 also outlines procedures relating to definitive proxy statements and other soliciting material, personal soliciting materials, release dates, and public availability of information (including copies of preliminary proxy statements and forms of proxy).

95.     Defendants have not followed these and other procedures and requirements set forth in Rule 14a-6.

96.     Defendants have violated Section 14(a) and Rule 14a-9 and will continue to do so if not enjoined.

**F.      Count Six:  Recovery Of Short-Swing Profits From Simmons, Contran, And Valhi To Hollywood Pursuant To § 16 Of The Securities Exchange Act And Rule 16a-1**

97.     Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs.

98.     Section 16(a) and Rule 16a-1 define certain corporate "insiders" and require those insiders to report their holdings and transactions in the issuing company's equity securities to the SEC on a monthly basis.

99.     Section 16(b) declares that these "insiders" – directors and officers of the issuing company and any other person who directly or indirectly beneficially owns more than 10% of any class of equity security of that issuer – are irrefutably presumed to possess nonpublic, inside information.

100.    Furthermore, Section 16(b) provides: "For the purpose of preventing the unfair use of information which may have been obtained by such [insider] by reason of his relationship to the issuer, any profit realized by him" from any purchase or sale of the issuer's equity securities "within any period of less than six months . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer."

101.    Simmons, Contran, and Valhi, are members of a "group" that includes but is not limited to Jack and Bill Pratt. As such, *all* group members are beneficial owners of more than 10% of Hollywood stock within the meaning of Section 16.

102.    Hollywood therefore is entitled to recover any and all profits received by any and all defendants from their purchases and sales of Hollywood securities within six months.

## G.    Count Seven:  Aiding and Abetting Breach of Fiduciary Duty (Against Simmons, Contran, and Valhi).

103.    Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs.

104.    Simmons, Contran, and Valhi have aided and abetted Jack Pratt and Bill Pratt to breach their fiduciary duties by, among other things, acquiring, purchasing, or otherwise obtaining Hollywood's securities based on non-public and confidential information.

105.    Defendants have joined together to accomplish an unlawful purpose or to accomplish a lawful purpose through unlawful means.

106.    As a result of this wrongful conduct, Hollywood has suffered damages in an amount to be determined by the trier of fact.

107.    Because defendants' acts were committed knowingly, intentionally, and with reckless and conscious disregard for the rights of Plaintiff, Plaintiff also seeks punitive damages in an amount to be determined by the trier of fact.

## H.    Count Eight:  Conspiracy to Breach Fiduciary Duty

108.    Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs.

109.   Defendants have conspired together to purchase, acquire, or otherwise obtain – directly or indirectly – shares of Hollywood Casino securities based on inside information known by Jack and Bill Pratt through their positions as former officers and current directors of Hollywood. Defendants' wrongful conduct is a violation of federal securities laws.

110.   Defendants have conspired with each other to accomplish an unlawful purpose or to accomplish a lawful purpose through unlawful means.

111.   Jack Pratt and Bill Pratt's unlawful conduct is a breach of their fiduciary duties as directors, former officers, and insiders of Hollywood.

112.   As a result of this conspiracy, Hollywood has suffered damages in an amount to be determined by the trier of fact.

113.   Furthermore, because defendants' acts were committed knowingly, intentionally, and with reckless and conscious disregard for the rights of Hollywood, Hollywood also seeks punitive damages in an amount to be determined by the trier of fact.

## VI.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.   an order compelling defendants to file a complete and accurate "group" Schedule 13D;

B.   an order enjoining defendants from purchasing, acquiring, or otherwise obtaining any additional Hollywood securities until they file an accurate Schedule 13D;

C.   an order requiring defendants to divest any Hollywood securities they acquired prior to filing an accurate "group" Schedule 13D;

D.  an order enjoining defendants from voting any shares obtained on or after August 10, 2001;

E.  an order enjoining defendants from making a tender offer for outstanding Hollywood securities;

F.  an order requiring defendants to comply will all statutes, rules, and regulations relating to the solicitation of proxies and tender offers;

G.  an award of damages to compensate Plaintiff for the harm caused by defendants' wrongful and tortious conduct and breaches of fiduciary duty;

H.  an award of damages representing all "short swing" profits received by defendants;

I.  an award of exemplary damages for defendants' intentional, wrongful, and tortious conduct;

J.  an assessment of reasonable costs and attorneys' fees; and

K.  such other and further relief as this Court deems just and proper.

## VII.

### JURY DEMAND

Plaintiff requests a jury trial on all questions of fact or combined questions of law and fact raised by this complaint.

Dated: April 9, 2002

Respectfully submitted,

**BICKEL & BREWER**

By:

William Brewer III
State Bar No. 02967035
James S. Renard
State Bar No. 16768500
Brian D. Hail
State Bar No. 00797808
Daniel S. York
State Bar No. 00786774

1717 Main St., Suite 4800
Dallas, Texas 75201
Telephone:      (214) 653-4000
Telecopier:     (214) 653-1015

**ATTORNEYS FOR PLAINTIFFS**
**HOLLYWOOD CASINO CORPORATION**

## <u>CERTIFICATE OF SERVICE</u>

A copy of the foregoing Plaintiffs' First Amended Complaint and Jury Demand was served on all Defendants via hand delivery, by the undersigned on the date indicated.

_____
Daniel S. York

166258 3